**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

AMERICAN ITALIAN WOMEN FOR    :
GREATER NEW HAVEN,            :        CIVIL CASE NO.
    Plaintiff,                 :        3:21-CV-01401 (JCH)
                               :
v.                             :
                               :
CITY OF NEW HAVEN,            :        JUNE 3, 2022
    Defendant.                 :

**RULING ON DEFENDANT'S MOTION TO DISMISS (DOC. NO. 10)**

**I.     INTRODUCTION**

Plaintiff American Italian Women for Greater New Haven ("AIW") brings this action against the City of New Haven, alleging four claims for relief stemming from the City's decision to remove a statue of Christopher Columbus from Wooster Square, a public park in the City.  See generally Compl. (Doc. No. 1).

The City has moved to dismiss AIW's Complaint in its entirety.  See Mot. to Dismiss (Doc. No. 10); Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Mem.") (Doc. No. 10-1); Reply to Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Def.'s Reply") (Doc. No. 16).  Plaintiff opposes this Motion.  See Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Def.'s Mem.") (Doc. No. 15).

For the reasons discussed below, the court grants the Motion to Dismiss.

**II.    ALLEGED FACTS**

In fourteen hundred ninety-two, Columbus sailed the ocean blue.  400 years later, the City of New Haven erected a statue in his honor.  In a ceremony on October 12, 1892, the Mayor of New Haven dedicated the statue, which had been a gift from approximately 200 Italian immigrants who had settled in New Haven.  Compl. at ¶ 4.

1

The Columbus statue has stood in Wooster Square ever since.  According to AIW, Wooster Square and the statue itself have been an important focal point of its organizational activities.  Id.  The group "meet[s] in Wooster Square [ ] for, among other activities, the Cherry Blossom festival", to recruit there, and to conduct an "annual wreath-laying ceremony . . . at the base of the statue" with approximately 40 other Italian heritage groups.  Id.

That all changed in 2020.  AIW alleges that, on June 17, 2020, an unplanned discussion about removing the statue occurred during a regular meeting of the Board of Park Commissioners.  Id. at ¶ 18.  "The agenda of [that] meeting [had] not include[d] any item relating to the removal of the statue as an agenda item."  Id.  Still, the Board came to a "consensus" that the statue should be removed during that meeting, even though it did not formally vote on the matter.  Id.  Approximately a week later, the statue was taken down.  Id. at ¶ 21.

According to AIW, the decision to remove the Columbus statue arose from the City's "pro-African American/anti-Italian American policy", a policy that the City deliberately "established and perpetuated."  Id. at ¶ 3.  IAW, as "a charitable organization with sixty members residing in the Greater New Haven area", brings four claims related to the removal of the statue and alleged discriminatory intent behind the decision.[1]  Id. at ¶ 12.  First, it alleges discrimination on the basis on national origin in violation of Title II, Section 201 of the Civil Rights Act of 1964.  Id. at ¶ 33.  Its next three

---

[1] IAW further describes the purpose of its mission and activities as to "recognize[ ] the work of prominent Italian Americans in the New Haven area and bestow[ ] scholarships and citizenship awards to deserving Italian American youth."  Id. at ¶ 4.  The organization also "donates to various local, charitable groups including but not limited to the Wounded Warrior Project, other veterans groups, animal rescue groups, [and] collaborat[es] with other Italian American societies."  Id.

claims are brought under section 1983 of title 42 of the U.S. Code ("section 1983").  In

Count Two, AIW again alleges nation origin-based discrimination, this time in violation

of the Equal Protection Clause of the Fourteenth Amendment.  Id. at ¶¶ 40-46.  In Count

Three, it brings a claim under the Due Process Clause of the Fourteenth Amendment.

Id. at ¶¶ 47-54.  Finally, IAW alleges that its First Amendment rights were violated in

Count Four.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed

for lack of subject matter jurisdiction . . . when the district court lacks the statutory or

constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d

Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).  A plaintiff bears the burden of proving the

existence of subject matter jurisdiction by a preponderance of the evidence.  Id.  When

determining whether to dismiss for lack of subject matter jurisdiction, a court may

consider affidavits.  All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d

82, 88 (2d Cir. 2006).  A court also "has discretion to hold a hearing to resolve factual

disputes that bear on the court's jurisdiction."  Saleh v. Sulka Trading, 957 F.3d 348,

353 (2d Cir. 2020).  However, a court must otherwise "accept as true all material facts

alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  Id.

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)

("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662,

3

678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[2]  "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to

dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual

allegations in a Complaint as true, and draws all reasonable inferences in the

nonmovant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However,

the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a

cause of action."  Iqbal, 556 U.S. at 678.

## IV.    DISCUSSION

The City has moved to dismiss AIW's Complaint under both Rule 12(b)(1) and

Rule 12(b)(6).  First, it argues that AIW lacks organizational standing to bring any of its

claims.  In addition, it argues that, in each of its four counts, AIW fails to state a claim

upon which relief can be granted.  Although the court concludes that AIW has standing

to bring its claims, it grants the Motion to Dismiss under Rule 12(b)(6) for failure to state

a claim.

---

[2] In its Memorandum, plaintiff's counsel incorrectly cites to Conley v. Gibson, 355 U.S. 41 (1957) as the correct standard for a motion to dismiss.  See Pl.'s Mem. at 3 (wrongly arguing that "[t]he test most often applied to determine the sufficiency of the Complaint was set out in the leading case of [Conley]").  The Supreme Court abrogated Conley well over a decade ago in Twombly and Iqbal.  See Twombly, 550 U.S. 544; Iqbal, 556 U.S. 662.  The court uses the correct standard here.

In addition, this court has previously cautioned that "it is wholly ineffective" for an attorney "to cite Conley" as the standard of review for a motion to dismiss under Rule 12(b)(6).  Arias v. East Hartford, No. 3:20-CV-00895, 2021 WL 3268846, at *2 n. 1 (D. Conn. July 30, 2021).  "In this court's view", doing so "violates counsel's duty to the court."  Id. (citing Fed. R. Civ. P. 11(b), "requiring counsel, in presenting a paper to the court, to 'certif[y] that to the best of [counsel's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . [the] legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law") (emphasis added).

A.      Organizational Standing

The requirement that a party have standing to assert its claims "is a prerequisite to [a] [c]ourt's subject matter jurisdiction."  Baker v. Bzydra, No. 3:18-CV-01792, 2019 WL 6619348, at *1 (D. Conn. Dec. 5, 2019).  "Organizations like [AIW] may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization."  Conn. Parents Union v. Russell-Tucker, 8 F.4th 167, 172 (2d Cir. 2021).  To establish "associational" or "representational" standing, the organization "must show, inter alia, that some particular member of the organization would have had standing to bring the suit individually."  New York Civil Liberties Union v. New York City Transit Auth., 684 F. 3d 286, 294 (2d Cir. 2012).  AIW does not attempt to do that here, as its Complaint is entirely devoid of any mention of any individual member of its organization.

Instead, AIW's standing argument appears to hinge on direct injury to itself as an organization.  See Pl.'s Mem. at 5-7.  "Under this theory of 'organizational' standing, the organization is just another person – albeit a legal person – seeking to vindicate a right."  New York Civil Liberties Union, 684 F.3d at 294.  "To qualify, the organization itself must meet[ ] the same standing test that applies to individuals."  Id. (internal quotations and citations omitted).  "To succeed on th[is] theory", therefore, "it is [AIW's] burden to satisfy the irreducible constitutional minimum of standing by showing: (i) an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the challenged act]; and (iii) that a favorable decision would redress its injuries."  Russell-Tucker, 8 F.4th at 172-73 (internal quotations and citations omitted).

Here, the locus of the court's inquiry is on the injury-in-fact requirement.[3]

Satisfying this element of the standing analysis requires a plaintiff to demonstrate "a

concrete and particularized harm to a legally protected interest." W.R. Huff Asset

Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008)

(internal quotations and citations omitted).  Such an injury must also be "actual or

imminent, not conjectural or hypothetical." Knife Rights, Inc. v. Vance, 802 F.3d 377,

383 (2d Cir. 2015) (internal quotations and citations omitted).  In the context of

organizational standing, meeting this burden requires "show[ing] that the challenged

action did not merely harm [the organization's] abstract social interests but perceptibly

impaired its activities." Russell-Tucker, 8 F.4th at 173 (internal quotations and citations

omitted).  For instance, when an organization is involuntarily forced to "divert[ ] its

resources away from its [other] current activities, or otherwise incurs some perceptible

opportunity cost", it has suffered an injury-in-fact, provided that the diverted resources

or opportunity cost are not incurred simply by opposing the law or regulation on a

voluntary basis.  Id. (internal quotations and citations omitted).  "[S]uch an expansive

concept of organizational injury" has been "reject[ed]" by the Second Circuit.  Id.

Instead, the court has stressed that "the injury-in-fact inquiry should focus on the

involuntary and material impacts on core activities by which the organizational mission

has historically been carried out." Id. at 174-75 (emphasis in original).  "In other words,

the challenged law or regulation must impose a cost (e.g., in time, money, or danger)

---

[3] Plaintiff "satisf[ies] the other two elements of the standing doctrine because [it] allege[s] that the [c]ity caused the injury by moving the monument and because [its] injury can be redressed via the requested injunction to have it returned." Gardner v. Mutz, 857 F. App'x 633, 635 (11th Cir. 2021).

that adversely affects one of the [core] activities the organization regularly conducted

(prior to the challenged act) in pursuit of its organizational mission." Id. at 173-74.

For instance, in Centro de la Comunidad Hispana de Locust Valley v. Town of

Oyster Bay, 868 F.3d 104 (2d Cir. 2017), the Circuit found that the plaintiff organization

had suffered an injury-in-fact where its mission involved "'end[ing] the exploitation of

Latino immigrant workers'" and "'building worker cooperatives'" and the town ordinance

it was challenging "banned soliciting employment on a public right-of-way."  See

Russell-Tucker, 8 F.4th at 174 (summarizing and quoting from the court's holding in

Oyster Bay).  This was because the ordinance burdened the entities "core activities" in

three ways: "(i) the ordinance would require the physical dispersal of laborers, which

would impede organizing activity, one of the entity's primary responsibilities; (ii) the

entity would have to divert resources from other of its activities to combat the effects of

the [challenged] [o]rdinance – i.e. the entity would have to expend additional resources

to continue organizing after the forced dispersal of laborers; (iii) the entity's members

would face the risk of erroneous arrest while conducting advocacy activities among

laborers, since those officials enforcing the challenged ordinance might not distinguish

advocates from laborers."  Id. (summarizing Oyster Bay) (internal quotations and

citations omitted).  In contrast, the organizational plaintiff in Russell-Tucker only "sp[oke]

loosely of its expenditures to counteract" the policy being challenged, but "fail[ed] to

identify any restrictions on its ability to perform the core activities – such as meetings,

lectures, and general organizing – by which it pursued its mission prior to the

[implementation of that policy]."  Id. at 175.  Accordingly, the organization did not have

standing to challenge the policy, as the only costs it had incurred were from its voluntary campaign against the policy. Id.

Here, AIW has alleged a material impact that the removal of the statue will have on its core activities. In particular, AIW participates in an annual ceremony where its members lay wreaths at the base of the statue on Columbus Day. See Compl. at ¶ 4. This event is consistent with the group's core organizational purpose of "acknowledge[ing], promot[ing,] and/or support[ing] Italian Americans in the greater New Haven" area by bestowing "scholarship and citizenship awards to deserving Italian American youth", donating to various veterans and animal rescue groups, and meeting in Wooster Square Park to recruit there. Id. at ¶¶ 4, 35. While the removal of the statue does not impede AIW's ability to use Wooster Square as a center for its activities – at least in a concrete and particularized way – the removal of the statue undisputedly "adversely affects one of the [core] activities [AIW] regularly conducted (prior to the challenged act) in pursuit of its organizational mission." Russell-Tucker, 8 F.4th at 173-74.

Circuit court cases from throughout the country support this conclusion, and stand for the general proposition that, when an organization "observe[s] or use[s]" the statue being removed as part of its core activities, the removal of that statue often constitutes an injury-in-fact for standing purposes. This principle is perhaps best illustrated by Gardner v. Mutz, a case involving the removal of a Confederate monument that reached the Eleventh Circuit twice on standing grounds. In Gardner I, the court assessed the injuries alleged "by a group of individuals and organizations" that objected to a city's removal of a Confederate monument. Gardner v. Mutz ("Gardner I"), 962

8

F.3d 1329, 1333 (11th Cir. 2020).  In their initial Complaint, plaintiffs alleged only that

"the [c]ity abridged [their] right to free speech" by removing the monument, and that "the

monument's relocation infringe[d] on their interests in preserv[ing] the history of the

south, expressing their free speech[ ] from a southern perspective, vindicat[ing] the

cause for which the Confederate Veteran fought, and protect[ing] and preserv[ing]

Memorials to American veterans."  Id. at 1341 (internal quotations omitted).  The court

found these allegations "too amorphous" and insufficiently concrete to establish

standing.  Id.  "At bottom", the court observed, "the plaintiffs endorse some meaning that

they ascribe to the monument; they agree with what they take to be [its] message

because it aligns with their values.  And because they agree with that message, they

disagree with – object to – the monument's removal . . . . But the plaintiffs' inchoate

agreement with what they take to be the [monument's] meaning or message – and their

consequent disagreement with [its] relocation – does not alone give rise to a concrete

injury for Article III purposes."  Id.

In addition to not finding plaintiffs' allegations to be sufficiently concrete, the court

also concluded that they had not "m[et] the standing doctrine's separate particularity

requirement."  Id. at 1342.  This was because they had alleged only "'a mere 'interest in

a problem'" which, "'no matter how longstanding the interest and no matter how

qualified [an] organization is in evaluating the problem, is not sufficient by itself'" to

establish standing.  Id. (quoting Sierra Club v. Morton, 405 U.S. 727, 739 (1972)).

Stated differently in the Second Circuit's terms, the plaintiffs in Gardner I had not met

their burden of "show[ing] that the challenged action did not merely harm [the

9

organization's] abstract social interests but perceptibly impaired its activities."  Russell-

Tucker, 8 F.4th at 173 (internal quotations and citations omitted).

In Gardner II, however, the Circuit held the opposite.  After plaintiffs moved to

amend their Complaint before the district court and added additional allegations specific

to their activities vis-à-vis the monument, the Circuit concluded the proposed

amendments were sufficient to allege an injury-in-fact for the purposes of establishing

standing.

In their proposed amended complaint, [plaintiffs] alleged the following facts:

- Multiple organizational plaintiffs include members who visit the monument to pay their respects to those it memorializes.  The members intend to continue to gather, and their political speech is rendered less effective by the removal of the monument.

- Multiple organizational plaintiffs include members who regularly gather at the monument to engage and educate the public.

- One plaintiff's ancestors collected donations for and erected the monument.  She also honors the war dead at the monument and wishes to continue to do so.

- One plaintiff gathered at the monument when it was at the old park, and spoke there.

- Multiple plaintiffs publish literature about the monument.

Gardner v. Mutz ("Gardner II"), 857 F. App'x 633, 634 (11th Cir. 2021).  In contrast to its

earlier holding, the Eleventh Circuit concluded that these newfound allegations were

sufficiently concrete and particularized to establish standing.  Quoting Gardner I, the

court observed that "[a]n injury is 'concrete' when it is 'de facto' and 'real,' rather than

merely 'abstract.'"  Id. at 635.  "An injury may be real even when it injures only the

plaintiff's interest in observing or using something.  If a plaintiff seeks injunctive relief,

like here, the plaintiff must demonstrate a plan to observe or use that space in the near

future that is obstructed by the challenged action." Id. (internal citations omitted).

Moreover, to meet the particularity requirement, the action must "affect the plaintiff in a

personal and individual way . . . . It must be distinct to the plaintiff rather than

undifferentiated." Id. (internal quotations and citations omitted).  Because plaintiffs had

"allege[d] that they visit the monument regularly and have concrete plans to visit [it]

again in the future", and that "their planned future use and enjoyment of the monument

[was] obstructed by the City's relocation of it", they had suffered an injury-in-fact.  Id.

The same is true here.  To be sure, the vast majority of AIW's alleged injuries are

of the sort that can aptly be described as advancing only its abstract interests.  See, e.g.

Compl. at ¶¶ 36, 50 (alleging, inter alia, that the removal of the statue denies them full

enjoyment of Wooster Square on the basis of their national origin and denies them a

meeting place that is a "tangible reminder of the value of the previous efforts of Italian

Americans in New Haven").  The allegation regarding the wreath-laying ceremony,

however, is tangibly different.  Similar to the Confederate heritage groups in Gardner II,

AIW has alleged "that they visit the monument regularly" – on an annual basis – with a

specific purpose of "using" the statue as the focal point for celebrating what remains a

federal holiday.  That activity is core to the group's mission, and its capacity to continue

it will necessarily be altered by the removal of the statue, causing the group to either

cease the ceremony or expend resources to alter it in some way.  Even if those

expenses are minimal and borne only in time, it is still sufficient for AIW to have suffered

an injury-in-fact here.

Accordingly, the court concludes that AIW has organizational standing to bring its

claim.

B.      Failure to State a Claim

Although AIW has standing to assert its claims, the court still grants the Motion to

Dismiss because the group has not stated a claim upon which relief can be granted.

1.      Count One

In Count One, AIW alleges discrimination based on national origin in violation of

Title II, section 201 of the Civil Rights Act, codified at section 2000a of title 42 of the

United States Code ("section 2000a").  Section 2000a provides that "[a]ll persons shall

be entitled to the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, and accommodations of any place of public accommodation . . . without

discrimination or segregation on the ground of race, color, religion, or national origin."

42 U.S.C. § 2000a(a).  In its Memorandum, AIW argues that it has adequately pled a

section 2000a claim because "Wooster Square . . . is a place of public accommodation

within the meaning of [the Act]", and the City implemented an "anti-Italian American

policy" that "thereby denied the [p]laintiff . . . full enjoyment of Wooster Square Park on

the basis of their national origin by the wrongful and/or illegal removal of the statue of

Christopher Columbus."  Pl.'s Mem. at 10.

The Second Circuit "has indicated that § 2000a claims may be analyzed using

the framework established for claims under 42 U.S.C. § 1981."  Stone v. New York

Public Library, No. 05 Civ. 10896, 2008 WL 1826485, at *3 (S.D.N.Y. Apr. 22, 2008)

(citing Lizardo v. Denny's, Inc., 270 F.3d 94, 106 (2d Cir. 2001)), aff'd 348 F. App'x 665,

666 (2d Cir. 2009) ("[h]aving conducted an independent examination of the record, we

conclude, for substantially the reasons stated by the district court, that Appellant failed

to meet his burden" on his section 2000a claim).  "Section 1981 claims are, in turn,

analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v.

12

<u>Green</u>, 411 U.S. 792 (1973)."  <u>Jalal v. Lucille Roberts Health Clubs Inc.</u>, 254 F. Supp.

3d 602, 606 (S.D.N.Y. 2017).  To establish a prima facie case of discrimination under

section 2000a, a plaintiff "must allege facts which show that he was deprived of equal

use and enjoyment of a covered facility's services and facts which demonstrate

discriminatory intent."  <u>Coward v. Town and Village of Harrison</u>, 665 F. Supp. 2d 281,

307 (S.D.N.Y. 2009) (internal quotations and citations omitted).

Here, plaintiff's argument fails for the simple fact that they have <u>not</u> been denied

access to Wooster Square in any way.[4]  Indeed, AIW has been explicit in stating that it

"has not alleged that it was denied access to Wooster Square."  Pl.'s Mem. at 17.  It has

alleged only that the Columbus Statue has been removed from the Square.  In other

words, AIW "concedes that [it] <u>was</u> given access, but t[akes] issue with the content on

display" – or lack thereof – in the park.  <u>Joseph v. Metro. Museum of Art</u>, 684 F. App'x

16, 17 (2d Cir. 2017).  "Accordingly, [AIW] fails to allege <u>any</u> denial of access or

different treatment than other visitors, which is required to sustain a [section 2000a]

claim."  <u>Id.</u>

For these reasons, the court grants the Motion to Dismiss as to Count I.

      2.     Count II

In Count II, AIW asserts an Equal Protection claim under the Fourteenth

Amendment based on the City's alleged national-origin discrimination in removing the

statue.  "The Equal Protection Clause of the Fourteenth Amendment is essentially a

---

[4] To the extent that plaintiff meant to argue that the statue itself was the place of public
accommodation to which it was denied access, the Supreme Court has been clear that monuments
displayed on public property are a form of government speech, not themselves a public accommodation.
<u>See generally</u> <u>Pleasant Grove City, Utah v. Summum</u>, 555 U.S. 460 (2009).  AIW appears to recognize
this, as it explicitly stated in its Memorandum that it "has not alleged that the statue is a place of public
accommodation."  Pl.'s Mem. at 17.

direction that all persons similarly situated should be treated alike." <u>Diesel v. Town of Lewisboro</u>, 232 F.3d 92, 103 (2d Cir. 2000) (internal quotations and citations omitted). To state an Equal Protection claim under a theory of selective treatment or enforcement, a plaintiff must sufficiently allege that: "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."[5] <u>Id.</u> (internal quotations and citations omitted).

Here, plaintiff has failed on both prongs. First, there is no allegation that AIW was treated less favorably than any other similarly situated individual, group, or organization. Plaintiff does make the conclusory allegation that the City has "established and perpetuated . . . a pro-African American/anti-Italian American policy." Compl. at ¶ 4. However, plaintiff has not alleged any facts to make this conclusory allegation even remotely plausible. Indeed, it is based on nothing more than: (1) a citation to <u>Ricci v. DeStefano</u>, 557 U.S. 557 (2009), a Supreme Court case concerning race discrimination in the promotional process for New Haven firefighters in 2003 that is wholly inapposite here;[6] (2) an allegation that "every member of the New Haven Board of Parks Commissioners was African-American" on the date of the meeting when the "consensus" was reached to remove the statue, and; (3) an allegation that the City

---

[5] Here, national origin discrimination would also be an "impermissible consideration[ ]" for the purposes of the second prong. See <u>Jana-Rock Const., Inc. v. New York State Dept. of Economic Development</u>, 438 F.3d 195, 204 (2d Cir. 2006).

[6] Moreover, it is notable that the Supreme Court did not discuss the national origin of the parties in <u>Ricci</u>, let alone specifically discuss Italian-Americans in New Haven or any community-wide friction between the African-American and Italian-American communities in the City.

"might incur the wrath of . . . influential leaders of New Haven's African-American community" if the statue was not removed.  Compl. at ¶¶ 7, 18 n. 1, 59.  Plaintiff's overarching claim of the City's pro-African-American/anti-Italian-American bias – and its allegation that not removing the statue would "incur the wrath" of the African-American community in the City – is precisely the sort of "bald allegation" the Supreme Court has held is "conclusory and not entitled to be assumed true" for the purposes of this Motion to Dismiss.  Iqbal, 556 U.S. at 681.  Moreover, though the court is bound to accept as true the allegations that Ricci did, in fact take place, and that each member of the New Haven Board of Park Commissioners was African-American, those "well-pleaded facts [do not] give rise to a plausible inference" that the City or the Board of Park Commissioners had a pro-African-American and anti-Italian-American bias.  Id. at 682.  Thus, on the facts alleged, AIW's conclusory allegation of such a bias "is not a plausible conclusion."  Id.

Moreover, even if it were, AIW would still fail on the first prong of its Equal Protection Claim because there is no allegation that AIW – or Italian-Americans more generally – were treated differently here.  According to the Complaint, the opportunity for any individual, group, or organization to object (or, for that matter, voice their support) regarding the removal of the statue was circumscribed.  Compl. at ¶¶ 18-22.  There is no allegation of differential treatment during that process and, as defendant aptly points out, the statue was ultimately "removed from everyone's view, not just the plaintiff's."  Defs.' Mem. at 11.  Thus, because AIW's allegations about a comparator are conclusory and, even if they were not, there is no allegation of differential treatment, it has failed to allege an Equal Protection claim.

3.      Count III

In Count Three, AIW alleges that its due process rights under the Fourteenth

Amendment were violated because the "Due Process Clause requires [that] the [City]

provide notice to the [p]laintiff . . . and an opportunity to be heard before [it] deprived

[AIW] of its interests in Wooster Square" by removing the statue.  Compl. at ¶ 48.

Plaintiff fails to state a claim in this Count because it has no liberty or property interest in

the statue which would trigger due process protections.

The Second Circuit "appl[ies] [a] familiar two-step inquiry" in reviewing whether a

plaintiff has stated a "[section] 1983 claim for violation of his Fourteenth Amendment

procedural due process rights."  Ciambriello v. County of Nassau, 292 F.3d 307, 313

(2d Cir. 2002).  A court "must determine (1) whether [plaintiff] possessed a liberty or

property interest and, if so, (2) what process [plaintiff] was due before [it] could be

deprived of that interest."  Id.  "When the government doesn't deprive someone of a

constitutionally protected liberty or property interest, it doesn't violate the Due Process

Clause of the Fourteenth Amendment."  Gardner II, 857 F. App'x at 636.

AIW here disclaims any liberty or property interest in the statue itself.  See Pl.'s

Mem. at 16 ("[t]he plaintiff has not alleged a liberty or property interest in the statue").

Rather, it "claims a property interest in the full enjoyment of Wooster Square Park by

and through 42 U.S.C. § 2000a."  Id. at 14.  It also "claims the liberty interest, the very

right, to support its community and engage in the tradition of its prior members who

created welcomed and created [sic], nurtured, and lead a community of Italian

immigrants and their descendants."  Id. at 16.  Section 2000a does not, however, grant

property interests to individuals in public spaces and, even if it did, AIW has not been

denied the use of Wooster Square.  See, supra, Section IV.B.1.  Nor is it clear how the

16

removal of the Columbus statue deprives AIW of its ability to support and lead its

community.  Accordingly, because AIW has failed to "allege that the City deprived [it] of

any constitutionally protected liberty or property interest by [removing] the [statue] . . .

the City didn't violate the Due Process Clause of the Fourteenth Amendment."  Gardner

II, 857 F. App'x at 636.

> The court grants the Motion to Dismiss as to Count III.

> > 4.     Count IV

> Finally, in Count Four, AIW alleges that the removal of the statue violated its First

Amendment rights.  Compl. at ¶ 56.  This claim fails, however, because the Columbus

statue is government speech and, as such, AIW has no cognizable free speech interest

in it.  Indeed, the Supreme Court has directly foreclosed such a claim.  In Pleasant

Grove City, Utah v. Summum, 555 U.S. 460 (2009), the Court "held that the messages

of permanent monuments in a public park constituted government speech, even when

the monuments were privately funded and donated."  See Shurtleff v. City of Boston,

Mass., 142 S. Ct. 1583, 1590 (2022) (summarizing Summum).  Where a city is

"communicat[ing] governmental messages", as is the case here, it is "free to choose the

[monument it displays] without the constraints of the First Amendment's Free Speech

Clause."  Id. at 1587.  This is in contrast to when a city opens up a space "for citizens to

express their own views", thereby creating a public forum and subjecting that forum to

First Amendment constraints.  Id.

> Here, the City has reserved the statue for its own expression and has not opened

up Wooster Square for citizens to display statues of their own choosing there.  Thus, the

decision to display (or remove) the statue is government speech not subject to "the

constraints of the First Amendment's Free Speech clause." Id.  The Motion to Dismiss is therefore granted as to Count Four.

## V.      CONCLUSION

For the reasons discussed above, the court grants the Motion to Dismiss without prejudice.  Plaintiff may move to Amend their Complaint in accordance with the local rules if – and only if – it has a basis in light of this Ruling to state a claim upon which relief can be granted.  Any such motion to amend shall be filed not later than twenty-one (21) days from the date of this Ruling.  If no such motion is filed, the case will be dismissed with prejudice.


**SO ORDERED.**

Dated at New Haven, Connecticut this 3rd day of June 2022.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge